**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JEREMY COLBERT** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2472** |
| **N. BURL CAIN** | **SECTION: "H"(1)** |

**REPORT AND RECOMMENDATION**

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Jeremy Colbert, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On March 7, 2007, he was convicted of manslaughter and attempted second degree kidnapping under Louisiana law.[1]  On May 11, 2007, he was sentenced to forty years imprisonment on the manslaughter conviction and to twenty years imprisonment without benefit of probation, parole, or suspension of sentence on the attempted second degree

---

[1] State Rec., Vol. 10 of 13, transcript of March 7, 2007, p. 79; State Rec., Vol. 1 of 13, minute entry dated March 7, 2007; State Rec., Vol. 3 of 13, jury verdict forms.

kidnapping conviction.[2]  On July 23, 2008, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[3]  The Louisiana Supreme Court then denied his related writ application on May 15, 2009.[4]

Beginning in May of 2010, petitioner sought post-conviction relief in the state district court.[5]  The court denied relief on August 12, 2013.[6]  His related writ applications were likewise denied by the Louisiana Fourth Circuit Court of Appeal on October 16, 2013,[7] and by the Louisiana Supreme Court on July 31, 2014.[8]

On or about October 24, 2014, petitioner filed the instant federal application for habeas corpus relief,[9] and he later amended that application to add additional claims.[10]  The state filed a response conceding that the application is timely but arguing that petitioner's claims should be denied on the merits.[11]  Petitioner filed a reply to that response.[12]

### Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections

---

[2] State Rec., Vol. 11 of 13, transcript of May 11, 2007; State Rec., Vol. 1 of 13, minute entry dated May 11, 2007.
[3] State v. Colbert, 990 So.2d 76 (La. App. 4th Cir. 2008); State Rec., Vol. 2 of 13.
[4] State v. Colbert, 8 So.3d 579 (La. 2009); State Rec., Vol. 2 of 13.
[5] State Rec., Vol. 2 of 13; see State Rec., Vol. 1 of 13, minute entry dated February 19, 2013.
[6] State Rec., Vol. 2 of 13, Judgment dated August 12, 2013; State Rec., Vol. 1 of 13, minute entry dated August 12, 2013.
[7] State v. Colbert, No. 2013-K-1358 (La. App. 4th Cir. Oct. 16, 2013); State Rec., Vol. 2 of 13.
[8] State ex rel. Colbert v. State, 146 So.3d 206 (La. 2014); State Rec., Vol. 2 of 13. While those post-conviction proceedings were ongoing, petitioner also filed a motion to correct an illegal sentence with the state district court. State Rec., Vol. 13 of 13.  That motion was denied on October 29, 2012.  State Rec., Vol. 13 of 13, Judgment dated October 29, 2012; State Rec., Vol. 1 of 13, minute entry dated October 30, 2012. His related writ applications were likewise denied by the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court.  State v. Colbert, No. 2012-K-1718 (La. App. 4th Cir. Feb. 5, 2013), writ denied, 118 So.3d 1120 (La. 2013); State Rec., Vol. 2 of 13.
[9] Rec. Doc. 1.
[10] See Rec. Docs. 8 and 12.
[11] Rec. Doc. 15.
[12] Rec. Doc. 16.

2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  <u>Bell</u>, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States]

> Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1706 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

### Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

5

Jonathan Jefferson was shot and killed on October 13, 2003, while standing in the parking lot of an apartment complex at 7700 Downman Road.  An autopsy revealed that Jefferson sustained six gunshot wounds, one of which was to his right temple and resulted in his death.  The forensic pathologist who conducted the autopsy stated that the shots were inflicted within twenty-four inches of Jefferson's body, as there was gunpowder residue on Jefferson's skin.  He also testified that an analysis of Jefferson's bodily fluids was negative for alcohol or drugs.

LSP Trooper Kevin Curlee testified that at approximately 12:30 a.m. on October 13, 2003, he and his partner were on patrol when they heard the NOPD broadcast of a shooting in the 7700 block of Downman.  They began canvassing the area, and as they turned onto Alabama Street, they saw a man who fit the description of the perpetrator.  The man ran from the officers and darted between two houses.  Trooper Curlee stated that he called for backup, and the officers blocked the surrounding streets.  Trooper Curlee testified that he went into one of the back yards in the area and saw the defendant Jeremy Colbert lying on the ground between a fence and a car parked in the driveway.  Trooper Curlee apprehended Colbert.  Soon thereafter, another officer arrived with a woman who was a witness to a shooting nearby.  That woman positively identified Colbert as the shooter.  Trooper Curlee testified Colbert was the only person he and his partner saw on the street that night.

On cross-examination, Trooper Curlee testified that he and his partner did not go to the scene of the shooting and did not see the victim.  He testified that he was not sure if there had been an earlier call of shooting in the area before the shooting in this case.  He stated that a gun was found in a back yard in the area a few days after the shooting.

Off. Avery Theard testified that he also responded to the call of the shooting in the 7700 block of Downman.  He testified that as he approached the gate of the complex at the corner of Wales Street and Downman, he saw a car come speeding out of the gate.  He tried to stop the car, but it sped away.  It then took a U-turn and came back.  A man exited the car and told the officer that someone had been shot.  Off. Theard testified that he went to the car and saw a man with gunshot wounds lying inside.  He testified that he called for EMS personnel.  When they arrived, they took the victim to the hospital.  Off. Theard returned to the parking lot and secured the area.

On cross-examination, Off. Theard testified that he had received an initial call of shots being fired in the area, and then there was a second call stating that someone had been shot.  He testified that when he entered the parking lot, he saw the victim's white car parked next to a red Mustang.  Off. Theard testified that he did not find any weapons on the scene.  He stated that he did not remember if he asked Jennifer Alexander, the witness, if she had a gun.

Det. Gregory Powell testified that the police first received a call of gunshots in the area of Downman and Alabama.  He testified that as he was approaching the area, he received a second call concerning a person down at 7700 Downman.  He testified that he went to the scene of the shooting and met with Jennifer Alexander,

6

who was standing outside in the parking lot.  He stated that Ms. Alexander told him that her friend Jonathan Jefferson had been shot by Colbert, whom she indicated was her ex-boyfriend and the father of her daughter.  Det. Powell testified that Ms. Alexander gave the officers Colbert's description and told them that he had fled towards Alabama Street.  Ms. Alexander then showed him where the shooting had occurred and identified a red Mustang as her car, an Oldsmobile as Jefferson's car, and a Pontiac as Colbert's car.  Det. Powell testified that all three cars were parked near the entrance to the parking lot.  He testified that after he received a call that a suspect had been captured, he took Ms. Alexander to the scene of the apprehension in the 7700 block of Alabama.  There, Ms. Alexander identified Colbert as the person who shot Jefferson.

Det. Wendell Russ testified that he was the lead investigator on the scene of the murder.  He testified that he found the driver's door of the victim's car open, and he could see blood on the driver's seat and on the ground outside.  He testified that he spoke with both Ms. Alexander and her stepfather, Mr. Roussel, and he took taped statements from both of them.  Det. Russ testified that he later advised Colbert of his rights when he interviewed him at the police station.  He testified that Colbert indicated that he understood his rights and wanted to wait until he had spoken with an attorney before making any decisions.  Det. Russ testified that even after so indicating on the waiver form, Colbert then told them that he was walking in the area of Alabama and Curran when someone began shooting at him, and he ran from the scene.  Det. Russ testified that this short statement was not recorded.  He also testified that a set of keys belonging to Ms. Alexander was seized from Colbert.

Det. Powell testified that Ms. Alexander pointed out Colbert's car on the scene of the shooting, and he obtained a search warrant for the car.  Inside the car, officers seized a photograph of an African-American female, an Auto Zone receipt in Colbert's name, a criminal district court order of release in his name, and an auto title form.  He testified that although no weapons were found on the night of the shooting, a few days later officers walking the area found a .357 caliber revolver under a pile of lumber in the back yard of a house near where Colbert was captured.  He testified that several casings were found near Wales and Alabama as well as on Downman Road.  Off. Aven Cooper of the crime lab testified that he processed the scene at 7713 Alabama, where the gun was found.  He testified that officers also found a black nylon scarf on the scene.  Off. Millet Green of the crime lab testified as to photographs he took at the scene of the murder.  Off. Ed DeLery of the crime lab testified that he processed a Pontiac pursuant to a search warrant and lifted forty-three partial latent fingerprints, twenty-six from the car's exterior and seventeen from the interior.  He indicated that the car was negative for any firearms evidence or obvious bloodstains.

Off. Kenneth Leary, an expert in ballistics and firearm identification, testified that he compared casings and bullets fired from the gun seized on Alabama to a bullet jacket recovered during the autopsy and bullet and jacket recovered from the victim at the hospital.  He testified that the bullet and jackets recovered at both places were fired from the gun seized on Alabama Street.

The parties stipulated that Anna Duggar would testify that she tested the same gun and found no identifiable fingerprints on it. They also stipulated that a DNA sample taken from a bloodstain on Colbert's T-shirt was consistent with a sample taken from him and inconsistent with a sample taken from Jefferson.

Jennifer Alexander began her lengthy testimony by describing her long-term relationship with Colbert that began while they were in junior high school. She testified that she became pregnant at age seventeen, and their daughter was born in 1999. She stated that their relationship was stormy throughout its duration. She testified that for a time after the baby was born she lived with Colbert at his mother's house, and some of the abuse she took from him occurred while they were living together there. She testified that on one occurrence in June 1999, they were arguing, and Colbert pushed her. She testified that Colbert's sister heard the argument and told Colbert to take a walk outside. Once he left, his sister locked the door, and she would not let him in when he returned. Ms. Alexander testified that she could not remember if anyone called the police during this incident. She then recounted another argument that occurred in November 2000 when she voiced her decision to leave him. She testified that the argument became violent, and Colbert bit her on the back and on her face. She testified that Colbert's family called her mother to come get her, and Colbert walked back and forth outside of the house, swinging a crowbar and telling everyone that no one could leave the house until he had spoken to Ms. Alexander.

Ms. Alexander testified that she eventually moved away, staying first with a friend and then getting an apartment at 7700 Downman Road, where she lived with her daughter. She testified that Colbert sometimes stayed with her, but she often put him out of the apartment. She testified that in January 2003, she went to Colbert's mother's house to pick up her daughter, and when she walked back outside, she saw Colbert standing near the gas cap of her car. She testified that the next morning she discovered that someone had put sugar in her gas tank. She testified that although she called the police during many of the incidents involving Colbert, she did not call them every time. Nonetheless, after one of the incidents an officer told her that she needed to get physical proof of Colbert's harassment. She testified that she bought a tape recorder, and in June 2003 she taped a telephone conversation they had when Colbert called her. The State played the tape for the jury, but its contents were not transcribed. Nonetheless, the tape apparently contained profane argument between the two, and in the tape Colbert accused Ms. Alexander of being involved in the theft of some rims from his car. She testified that Colbert also accosted her and accused her and her boyfriend of stealing the rims, and he hit her across the face with a gun during the incident. She also testified that she obtained at least one "stay away" order issued to Colbert.

Ms. Alexander testified that on October 12, 2003, the day before the shooting, she and her friend Nicole pulled into the parking lot of her apartment complex, and she saw a man ducking down into the bushes by the building. She testified that she decided to stay at her friend's house, and as she exited her friend's car and got into hers, Colbert walked up and knocked on her window, asking where

she had been.  She replied that her whereabouts were none of his concern, and he replied, "I got you. I got you."  Colbert then walked away.

Ms. Alexander testified that the next day Colbert repeatedly called to threaten her.  She testified that her mother and her stepfather came to her apartment because she was afraid to be there alone.  She testified that that evening Jefferson, whom she had met a few weeks before and whom she described as being just a friend, came over to her apartment to watch movies.  She testified that she and Jefferson later left to get gas in her car.  She testified that when they returned to the parking lot, Colbert walked up to her car and told her he wanted to talk to her.  Ms. Alexander testified that she told Jefferson to get in his car but to call her in ten minutes.  She testified that she also got into Jefferson's car to call her mother, who was inside her apartment.  She stated that as Jefferson walked to the driver's side of his car, she heard a shot, and when she looked up, she saw Colbert shooting at Jefferson.  She testified that Colbert then came to her side of the car, held a gun to her, and told her to get out of the car, threatening to kill her if she told anyone what had happened.  She testified that Colbert then took her over to her car and tried to put her in the back seat.  She stated that she told him their daughter was inside the apartment with her best friend, and she got away from him.  She testified that she ran to her apartment door, and her mother opened the door.  She testified that she then called 911.  The State played the 911 tape for the jury.

Ms. Alexander testified that she and her stepfather went back outside, and they found Jefferson.  She testified that they put him into her mother's car, and they started driving to a hospital when they saw the police.  She testified they went back to the apartment complex, and Jefferson was transported by ambulance to the hospital.  She testified that she saw Colbert's car at the entrance to the apartment complex.  She was shown in court the scarf seized from the back yard of the house on Alabama Street, and she identified it as the doo rag that Colbert was wearing that night.  She testified that she identified Colbert later that night a few blocks from the apartment complex, and she also gave a statement to the police that night.

On cross-examination, she testified that when she entered her apartment after the shooting, she told her mother and stepfather that Colbert had shot Jefferson, but she did not mention that he had tried to kidnap her by trying to put her into her car.  She testified that as she and Colbert struggled at her car, he got her keys, and he followed her as she started to run toward her apartment.  However, Colbert ran away when she reached the apartment and her mother opened the door.  She insisted that her mother did not have a gun and that no one spoke to Colbert after the shooting because he ran away.

Defense counsel questioned Ms. Alexander at length about the contents of the taped conversation.  She testified that she made the tape in the summer of 2003, just after Colbert had been released from prison.  She testified that the boyfriend referred to in the conversation was a man named Wilbert, and she broke off the relationship with him due to harassment from Colbert.  She testified that on the tape, when Colbert stated that he was going to "show her," she interpreted this statement as being a threat.  She testified that although she did not tell Colbert that

she was taping the conversation, he gave her the impression that he knew she was taping it. She testified that Colbert accused her of disrespecting him and always accused her of doing bad things. She stated that she told him that she did not have to speak with him except about their daughter. She testified that she gave the tape to the police a few days after she made it, and she reminded the police of the tape after the shooting. She also testified that shortly after the shooting, she briefly moved in with Colbert's sister.

Defense counsel questioned her about her use of a cell phone registered in Colbert's father's name. While she at first stated that she did not know anything about the phone, she then stated that Colbert had given her the phone, but it was shut off shortly after the shooting. When asked why the phone bill showed five calls to Colbert from that phone on the day preceding the shooting, Ms. Alexander insisted that these calls were incoming calls, not outgoing calls. Ms. Alexander admitted that since the storm, her daughter has been living with Colbert's mother in order to continue her schooling. She denied writing any letters to Colbert since the shooting. She also denied being with Colbert two nights before the shooting.

With respect to the events leading up to the shooting, Ms. Alexander testified that she stayed the night before the shooting with her female friend because she had seen Colbert hiding in the bushes when they came home. She reiterated the testimony she gave on direct examination concerning the shooting. She stated that although the lighting in the parking lot was not too good, she knew Colbert and easily recognized him. She testified that when Colbert was trying to force her into her car, and she told him that their daughter was inside the apartment with her friend, Colbert responded that he would have to kill her, too. She stated that no one else was in the parking lot at the time of the shooting.

On redirect, Ms. Alexander testified that she made phone calls to Colbert on the cell phone to warn him not to contact her anymore. She testified that she did not hear any other gunshots in the area that night. She testified that she never prevented Colbert from seeing their daughter prior to the shooting. She stated that she and Colbert were together for three to four years, but they broke up for good in January 2003. She testified that she started dating Wilbert after she learned that Colbert was dating other women, but she insisted Colbert always acted as if they were still dating. She testified that the incident wherein Colbert accused her of stealing the rims from his car, as well as an argument they had while she was washing her car, occurred before she made the tape of their conversation.

Off. Jay Jaquet of the NOPD Latent Print Unit testified that he examined the fingerprints lifted from Colbert's car. He testified that four prints matched those of Colbert, eight matched a person named Tiki Moses, and none of them matched prints taken from Jefferson in the morgue.

The State introduced true copies of two "stay away" orders issued to Colbert, one filed in April 2003 and signed by Colbert in May 2003, and another filed and signed by Colbert in June 2002.[13]

---

[13] State v. Colbert, 990 So.2d 76, 79-83 (La. App. 4th Cir. 2008); State Rec., Vol. 2 of 13.

## **Petitioner's Claims**[14]

## **Insufficient Evidence/Erroneous Denial of Post-Trial Motions**

Petitioner argues that there was insufficient evidence to support his convictions and that the state district court erroneously denied his post-trial motions.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied those claims, holding:

> We initially consider [appellant's] second assignment of error as it raises an issue of sufficiency of the evidence.  In his second assignment of error, the appellant argues that the trial court erred by denying his motions for post verdict judgment of acquittal, for new trial, and for arrest of judgment.  With respect to the motion for post verdict judgment of acquittal, he sets forth no specific argument, but instead merely alleges that the evidence adduced at trial was insufficient to support his manslaughter and attempted second degree kidnapping convictions.  However, after reviewing the record, we find the evidence was sufficient to support both convictions.
>
> The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in State v. Brown, 2003-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18:
>
>> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt."  State v. Neal, 00-0674, (La. 6/29/01)[,] 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La. 1984)).
>>
>> When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  Neal, 796 So.2d at 657.  Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury.  Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La. 1986)).

---

[14] For ease of analysis, this Report and Recommendation addresses petitioner's claims in a different order than they were listed in his federal application.  However, all of his claims are addressed herein.

See also State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, 2004-1199 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.

Here, the appellant was charged with the second degree murder of Jonathan Jefferson but convicted of the responsive verdict of manslaughter.  Second degree murder is defined in pertinent part as "the killing of a human being:  (1) When the offender has a specific intent to kill or to inflict great bodily harm."  La. R.S. 14:30.1. La. R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act."  Specific intent may be inferred from the circumstances and actions of the defendant.  State v. Brown; State v. Williams, 2005-0459 (La.App. 4 Cir. 1/18/06), 925 So.2d 567; State v. Hebert, 2000-1052 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041.  Specific intent can be formed in an instant.  State v. Cousan, 94-2503 (La. 11/25/96), 684 So.2d 382; Williams.  By contrast, R.S. 14:31 defines manslaughter in part as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection.  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

As the State notes, evidence sufficient to support the charged offense will be deemed to be sufficient to support the responsive verdict where the defendant does not object to the inclusion of the responsive verdict.  See State v. Harris, 2002-1589 (La. 5/20/03), 846 So.2d 709; State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La. 1982).

Here, Ms. Alexander testified that the appellant approached her and Jefferson as they exited her car after returning to the parking lot of her apartment complex.  She testified that the appellant shot Jefferson several times while Jefferson was attempting to get into his car, where she had taken refuge.  Although the defense tried to show that Ms. Alexander fabricated this testimony and that the appellant ran from the police because someone had been shooting at him a few blocks from the scene, the jury chose to believe Ms. Alexander's testimony that she saw the appellant repeatedly shoot Jefferson.  This court has repeatedly held that a factfinder's credibility decision should not be disturbed unless it is clearly contrary to the evidence.  State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432.  Nothing in the record before us indicates that the jury's credibility finding is clearly contrary to the evidence.

Likewise, the appellant alleges that the evidence was insufficient to support his conviction for the attempted second degree kidnapping of Ms. Alexander. La. R.S. 14:44.1 A(5) defines second degree kidnapping in pertinent part as: "the doing of any of the acts listed in Subsection B wherein the victim is: ... (5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon ... B. For purposes of this Section, kidnapping is: (1) The forcible seizing and carrying of any person from one place to another." In addition, La. R.S. 14:27 defines an attempt as occurring when "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." Ms. Alexander testified that after the appellant shot Jefferson, he came around to her side of the car, ordered her out at gunpoint, threatened to kill her, and took her over to her car, where he tried to get her to enter the back seat. This unrefuted testimony established the elements of attempted second degree kidnapping. Thus, the trial court did not err by denying the motion for a post verdict judgment of acquittal.

With respect to the motion for new trial, the motion alleged that the evidence was not sufficient to support the verdict (La.C.Cr.P. art. 851(1)) and that a new trial should have been granted to satisfy the ends of justice (La.C.Cr.P. art. 851(5)). As to the first ground, the denial of a motion for new trial based upon La.C.Cr.P. art. 851(1) is not subject to review. See State v. Toups, 2000-1944 (La.App. 4 Cir. 10/8/03), 859 So.2d 768; State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093. This holding is based upon the reasoning that review of a ruling on a motion for new trial is limited to a review of "error of law," see La.C.Cr.P. art. 858, and that a trial judge's ruling on a motion for new trial on the basis that the verdict is contrary to the law and evidence is grounded on the court's reassessment of the weight of the evidence, not the actual sufficiency of the evidence, which would bar a new trial. See State v. Mack, 37,174 (La.App. 2 Cir. 6/27/03), 850 So.2d 1035. Thus, this court cannot consider the trial court's ruling on the motion for new trial on this basis. Likewise, the Court has held that a trial court's ruling on a motion for new trial based upon La.C.Cr.P. art. 851(5) presents nothing for review. See State v. Toomer, 395 So.2d 1320 (La. 1981); State v. Haywood, 2004-2097 (La.App. 4 Cir. 6/15/05), 907 So.2d 168. Therefore, this court cannot review the trial court's denial of the motion for new trial based upon either subsection (1) or subsection (5) of La.C.Cr.P. art. 851.

Regarding the motion in arrest of judgment, the appellant alleged that the verdict must be vacated because the State did not timely institute prosecution of the offenses, tracking the language of La.C.Cr.P. art. 859(7), and therefore the delay deprived him of the benefit of useful and exculpatory evidence. However, as per La.C.Cr.P. art. 572 A(1), the State had six years to institute prosecution of the attempted kidnapping charge, and as per La.C.Cr.P. art. 571, the State had no limitation for instituting prosecution of the second degree murder charge. The crimes occurred on October 13, 2003, and the jury returned its indictment on December 11, 2003, less than two months after the crimes occurred. Thus, there was no basis for the court to grant relief on this ground. In its brief, the State

addressed the issue of whether the State complied with the time limitations of La.C.Cr.P. art. 578 for commencing trial.  However, this is not a ground upon which a motion in arrest of judgment may be granted.  In State v. Ijaz, 427 So.2d 848 (La. 1983), the Court held that grounds listed in La.C.Cr.P. art. 859 are exclusive, and thus, a court cannot entertain any other grounds when considering a motion in arrest of judgment.  Therefore, the trial court did not err by denying the motion in arrest of judgment.  The appellant's claims as to the denial of his motions for post verdict judgment of acquittal, a new trial, and in arrest of judgment have no merit.[15]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[16]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that he has made no such showing.

As correctly noted by the Louisiana Fourth Circuit Court of Appeal, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001)

---

[15] State v. Colbert, 990 So.2d 76, 83-86 (La. App. 4th Cir. 2008) (footnotes omitted); State Rec., Vol. 2 of 13.
[16] State v. Colbert, 8 So.3d 579 (La. 2009); State Rec., Vol. 2 of 13.

(quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").  Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, only the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.   Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due

Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

In this case, petitioner's guilt was primarily established through the testimony of Jennifer Alexander.  Under both federal and Louisiana law, the testimony of a single eyewitness is generally sufficient to support a conviction.  See United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); State v. Neal, 796 So.2d 649, 658 (La. 2001); see also Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr.11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012).   Although petitioner argues that Alexander was lying, the jurors, as was their right, obviously chose to believe her.   Where, as here, a petitioner's insufficient evidence claim is based on arguments concerning witness credibility, a federal habeas court generally will not grant relief. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips, 2012 WL 2564926, at *14; Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

16

Further, to the extent petitioner is also arguing that his post-trial motions were erroneously denied, a denial of such motions does not violate an independent, cognizable federal constitutional right.  See Haygood v. Quarterman, 239 Fed. App'x 39, 42 (5th Cir. 2007).  Rather, as the state correctly notes in its response, the motions involved issues of *state* law, and it is clear that a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); see Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).

Lastly, with respect to this claim, the Court notes that petitioner incorporates vague references to purported prosecutorial misconduct, referencing "fabricated testimony"[17] and "knowingly false accusations."[18]  As the state notes in its response, this claim, although unclear, appears to be alleging that the prosecution knowingly presented false testimony at trial.  If that is indeed petitioner's contention, he has failed to meet his burden of proof with respect to such a claim.

It is true that due process may be violated if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996).  However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was actually false, (2) the prosecutor knew it was false, and (3) the testimony was material.  Duncan v. Cockrell, 70 Fed. App'x 741, 744 (5th Cir. 2003).  Here, petitioner has

---

[17] Rec. Doc. 1, p. 11.
[18] Rec. Doc. 16, p. 4.

17

presented no evidence whatsoever showing that any witness gave false testimony, much less that the prosecution was aware of such false testimony. On the contrary, his allegations are wholly conclusory and unsupported; as such, they fail to state a viable claim of prosecutorial misconduct. See, e.g., Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990) (holding that bare allegations of prosecutorial misconduct do not establish due process violation).

For all of these reasons, petitioner has failed to meet his burden of proof to establish that he is entitled to relief with respect to any of these claims.

## Denial of Impartial Jury

Petitioner also argues that he was denied his right to an impartial jury. On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he appellant argues that the trial court erred by denying his request to remove a juror during trial. During the second day of trial, after crime lab witnesses had testified, the court sent the jury to the jury room but asked one juror, Ms. Angelico, to remain. Once the other jurors had gone, the court stated that Ms. Angelico had indicated that her work for LSU hospitals brought her into contact with bullets that were turned over to the police. Ms. Angelico then testified that although she worked for the LSU system, her office was in Charity Hospital in New Orleans. She testified that her job brought her into contact with coroner's offices and police from all over the state, and she had in the past turned over ballistic evidence to NOPD. She testified that generally other personnel handled this task, but she stated that if police officers arrived to retrieve material discovered in the operating room and hospital police officers were not available to escort the officers upstairs to retrieve the evidence, she would do so, and her signature would be on the chain of custody forms. She testified that although she was working in this capacity on October 13, 2003, the date of the shooting, she had nothing to do with this case; if she did, her name would have appeared in the documentation. She insisted that she did not know anything about the shooting or know the witnesses who testified. She indicated that she would not have been involved in the transfer of any evidence taken in the emergency room; the evidence she saw being transferred was taken from the operating room. When asked if her employment would "make any difference to you," she replied that it would not because it was just a part of her job.
>
> After reiterating that Ms. Angelico was not involved in the transfer of evidence from the emergency room, the court noted that the victim died before getting to the hospital, and thus there was no operation performed on him. After

18

Ms. Angelico left chambers, defense counsel moved to have her removed and replaced by the alternate juror, noting that Ms. Angelico apparently felt strongly enough about the matter to bring it to the court's attention.  Defense counsel also theorized that Ms. Angelico could have been involved in the chain of custody in this case.  The prosecutor replied that nothing indicated that she was involved in the case.  The court then stated:

> Again, I listened to Ms. Angelico, and she has said that the only interface, as she put it, that she would have is when police officers would come to recover something when the patient was in the operating room and/or recovery room.  The victim never made it to either one of those places.  He was at most confined to the ER room at the Medical Center.  Ms. Angelico further in this Court's ultimate discretion finds that even not withstanding the outside chance that she may have been in some way in contact with this case, it would not influence her in any way or change her opinion about her ability to be a fair and impartial juror.  The Court finds that Ms. Angelico can still remain a juror in this case.  And that virtue of her employment does not in and of itself disqualify her absent any other showing.

The defense objected, and the jury then returned to court.  The appellant now argues that the State failed to show that Ms. Angelico could be a fair and impartial juror.

La.C.Cr.P. art. 789 provides for the removal of jurors and replacement with alternate jurors when the original jurors "become unable to perform or [are] disqualified from performing their duties."  When there is an allegation that a juror must be replaced, the trial court must hold an evidentiary hearing with all parties to determine if the juror needs to be removed.  State v. Fuller, 454 So.2d 119 (La. 1984).  A trial court has great discretion in ruling on the qualifications for a juror to serve, and its ruling should not be disturbed unless the reviewing court finds a clear abuse of this discretion.  State v. Jones, 315 So.2d 650 (La. 1975).

Removal and replacement of a juror is warranted when the juror is found not to be impartial.  For example, in State v. Sepcich, 473 So.2d 380 (La.App. 5 Cir. 1985), the juror discovered during trial that she knew some of the witnesses because she shopped in the store where the crime occurred.  She notified the court, and during a hearing, she said she could not be impartial or fair due to this knowledge.  The court removed her and replaced her with an alternate juror.  The appellate court affirmed the trial court's ruling.  Likewise, in State v. Maillian, 464 So.2d 1071 (La.App. 1 Cir. 1985), the juror noticed a woman whom she knew sitting behind the victim's mother.  She indicated that if the woman, whom she greatly admired, had some connection to the victim, she could not be impartial to the defense.  When she learned that the woman was married to the victim's uncle, she declared that she could not be impartial.  The trial court replaced her with a alternate juror, and the appellate court upheld the trial court's action.

In two cases this court upheld the trial court's replacement of an original juror with an alternate.  In State v. Derouselle, 97-2590 (La.App. 4 Cir. 8/30/00), 769 So.2d 141, on remand from the Supreme Court, this court found that the trial court properly replaced a juror who had answered during voir dire that none of her family or close friends had been convicted of a crime, but during the trial she broke down when she learned that her fiancé's federal parole had been revoked.  Although the juror indicated at a hearing that she would not hold this fact against the State, the trial court still replaced her.  In State v. Williams, 460 So.2d 2 (La.App. 4 Cir. 1984), the court replaced a sitting juror when the State learned that she had indicated in other trials that she could not be fair to the State.  During an *in camera* hearing, the juror indicated that she could not be fair because she had a brother serving time in Angola.

By contrast, courts have found that replacement was not necessary when there was no showing that the juror could not be fair or impartial.  In State v. Packnett, 04-709 (La.App. 5 Cir. 12/28/04), 892 So.2d 615, a juror told the bailiff that they should all pack up and leave because "we" had heard enough.  When questioned by the court, the juror indicated that he had not discussed the case with the other jurors and had not made up his mind as to the defendant's guilt.  The trial court refused to replace him with an alternate juror, and the court's decision was upheld on appeal.  In State v. Gabriel, 542 So.2d 528 (La.App. 5 Cir. 1989), the juror realized he knew the victim when the victim got up to testify.  Defense counsel requested a mistrial, but the State suggested that the juror be replaced.  Defense counsel then maintained that the court was not authorized to do so and insisted on the mistrial.  The court denied the motion for mistrial and did not replace the juror.  The appellate court affirmed the defendant's resulting conviction, noting that the juror's statements did not show a basis to replace her merely because she realized that she knew the victim.  In State v. Ducksworth, 496 So.2d 624 (La.App. 1 Cir. 1986), the defense alleged both during voir dire and again during trial that the juror knew the murder victim's family.  The court conducted a hearing during trial wherein the juror insisted that she did not know the family.  The court then refused to replace the juror.  The appellate court rejected the defendant's assignment of error alleging that the trial court erred.  The court noted that the record showed no cause to replace the juror.

Here, the juror indicated that her work occasionally brought her in contact with police officers who retrieved ballistics evidence from the hospital where she worked.  However, she knew nothing about the present case, and because she was not involved with any evidence retrieved from the emergency room, where the victim had been taken, she would have had no contact with the evidence in this case.  She indicated that the fact that she came in contact with officers would not make any difference to her with respect to this case.  Given this testimony, there would have been no basis for the trial court to find that she was partial or could not

be fair.  Thus, the trial court properly denied the request to remove her and replace her with an alternate juror.  This assignment has no merit.[19]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[20]

To the extent that petitioner is arguing that the state courts misapplied state law in finding that Ms. Angelico was qualified to serve as a juror in this case, that, again, is not an issue properly before this Court.  The state courts decided this issue against petitioner, and the federal courts have no authority to overrule or second-guess the state courts' rulings on the interpretation or application of state law.  On the contrary, it is beyond cavil that the state courts are the final arbiters of state law.  See Levy Gardens Partners 2007, L.P. v. Commonwealth Land and Title Insurance Co., 706 F.3d 622, 629 (5th Cir. 2013) ("The principle that state courts are the final arbiters of state law is well-settled."); Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding."); see Charles v. Thaler, 629 F.3d 494, 500-01 (5th Cir. 2011) ("A federal court lacks authority to rule that a state court incorrectly interpreted its own law. When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law.").

That said, the United States Constitution also independently protects a criminal defendant's right to be tried an impartial jury.  Ross v. Oklahoma, 487 U.S. 81, 85 (1988) ("It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury.").  Therefore, to the extent that petitioner is claiming that his *federal* rights were

---

[19] State v. Colbert, 990 So.2d 76, 89-91 (La. App. 4th Cir. 2008); State Rec., Vol. 2 of 13.
[20] State v. Colbert, 8 So.3d 579 (La. 2009); State Rec., Vol. 2 of 13.

violated, that issue is obviously properly before the Court.  Nevertheless, for the following reasons, the undersigned finds that there was no federal violation.

"The constitutional standard for juror impartiality requires that an individual juror be able to "lay aside his ... opinion and render a verdict based on the evidence presented in court." See Irvin v. Dowd, 366 U.S. 717, 723 (1961).  Here, there was no evidence whatsoever that Ms. Angelico would be unable to perform her duties as a juror impartially.  On the contrary, petitioner's claim is based on nothing more than mere speculation that Ms. Angelico might be biased because, as part her occupation, she was occasionally required to handle evidence and interact with law enforcement officers.  However, there is no evidence that she handled the evidence or had any interactions with officers *in this case*.  Moreover, her occupation obviously did not alone disqualify her from serving as a juror, because "a trial court is not required to excuse any juror on the basis of his occupational background so long as the court is able to conclude that the juror would be able to view the evidence and decide the case without bias."  United States v. Nururdin, 8 F.3d 1187, 1191 (7th Cir. 1993) (quotation marks omitted).[21]

As noted, the trial judge determined that Ms. Angelico was credible in stating that she could perform her duties as a juror without bias, and that finding is entitled to deference on federal *habeas* review.  "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within the trial judge's province."  Wainwright v. Witt, 469 U.S. 412, 428 (1985).  "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the

---

[21] It has been noted that even "one's official position as a member of the law enforcement community does not require a court in the exercise of its discretion to excuse a juror for cause where the juror has stated that he or she could remain impartial."  United States v. McCord, 695 F.2d 823, 828 (5th Cir. 1983).  This truism obviously applies with greater force where, as here, the juror's relationship is not actually part of the law enforcement community but instead has only occasional interactions with that community.

venire, and of the individuals who compose it, a factor of critical importance in assessing the

attitude and qualifications of potential jurors." <u>Uttecht v. Brown</u>, 551 U.S. 1, 9 (2007).  Where

federal courts do not accord this deference, they "fail[] to respect the limited role of federal habeas

relief in this area prescribed by Congress and by [the Supreme Court's] cases."  <u>Id</u>. at 10; <u>accord</u>

<u>Fuller v. Johnson</u>, 114 F.3d 491, 500-01 (5th Cir. 1997).

   Accordingly, for all of these reasons, this claim should be denied.

### Improper Admission of "Other Crimes" Evidence

   Petitioner next argues that evidence of his other crimes was improperly admitted at trial.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he appellant contends that the trial court erred by allowing the State to introduce evidence of other bad acts purportedly perpetrated by him against Ms. Alexander. He argues that there was no valid purpose for the introduction of this evidence, and its prejudicial effect far outweighed its probative value.
>
>   The State sought to introduce this evidence under La. C.E. art. 404(B)(1), which provides:
>
>>    Except as provided in Article 412 [not applicable here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to the conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
>
>   As per <u>State v. Miller</u>, 98-0301 (La. 9/9/98), 718 So.2d 960, the factor listed in art. 404 B(1) which the State intends to prove through the use of other crimes evidence must either be an element of the crime charged, be at issue in the case, or have some independent relevance to the case.  The State must prove by clear and convincing evidence that the defendant committed the other crime.  Even if the evidence is relevant, the trial court may exclude it if its probative value is substantially outweighed by prejudicial effect, or if it would confuse the jury or

waste the court's time.  See La. C.E. art. 403.  In addition, the State must meet the requirements set forth in State v. Prieur, 277 So.2d 126 (La. 1973) with respect to pretrial written notice of its intent to use this evidence and a detailed description of the prior bad acts.  State v. Gibson, 99-2827 (La.App. 4 Cir. 4/11/01), 785 So.2d 213.  The Supreme Court urged caution in the use of art. 404(B) in State v. Kennedy, 2000-1554, p. 5 (La.4/3/01), 803 So.2d 916, 920:

> Simply put, the rule articulated in Article 404(B)(1) prohibits the State from introducing evidence of other crimes, wrongs, or acts to show a probability that the accused committed the charged crime because he is a "bad" person who has a propensity for this type of offense.  This court has long recognized that evidence of previous criminal activity does affect, reasonably or not, the opinions of the jurors sitting in judgment.  See State v. Moore, 278 So.2d 781, 787 (La. 1972) (on rehearing).  Therefore, the admissibility of other unrelated misconduct "involves substantial risk of grave prejudice to a defendant."  State v. Prieur, 277 So.2d 126, 128 (La. 1973) (citing 1 Wigmore, Evidence, § 194 (3rd ed.)).

In State v. Rose, 2006-0402, p. 13 (La. 2/22/07), 949 So.2d 1236, 1243-1244, the Court discussed the balancing test of undue prejudice and probative value:

> Although a defendant's prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted.  La. C.E. art. 403.  Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree.  State v. Germain, 433 So.2d 110, 118 (La. 1983).  As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.  Id.  See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

In Rose, the defendant was convicted of the strangulation murder of his second wife.  At trial, the State introduced evidence of the defendant's manslaughter conviction in the stabbing death of his first wife, of his conviction of violent acts against the first wife before her death when they were estranged, and of violent acts committed against the second wife (the victim in the case) while they were separated.  Although this court reversed the defendant's conviction, finding that the acts against the first wife were not similar enough to be admissible in the

second degree murder trial involving his second wife, State v. Rose, 2005-0396 (La.App. 4 Cir. 1/18/06), 925 So.2d 34, the Supreme Court reversed, finding that this evidence was admissible both to show identity (there were no independent witnesses to the murder) and motive.  With respect to the use of other crimes evidence to prove motive, the Court stated:  "For evidence of motive to be independently relevant, it must be factually peculiar to the victim and the charged crime.  State v. Lafleur, 398 So.2d 1074, 1080 (La. 1981)."  State v. Rose, 2006-0402 at p. 15, 949 So.2d at 1244.  The Court also quoted from State v. Welch, 615 So.2d 300, 303 (La. 1993):  "[T]he state could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the victim and the defendant....  The primary purpose of the evidence [of prior acts of violence or threats of violence] was not to prove Welch's bad character but to illustrate the volatile nature of his relationship with the victim...."  State v. Rose, 2006-0402 at p. 15, 949 So.2d at 1245.

Here, the State sought to introduce several incidents that occurred before the shooting and attempted kidnapping in 2003.  The court disallowed all that occurred prior to the summer of 2003 that did not result in a police report, but it allowed the State to present evidence as to incidents that resulted in police action as well as incidents from the summer of 2003 where the police were not called.  Ms. Alexander testified as to most of these incidents.[FN4]  The appellant does not now claim that the State failed to comply with the notification requirements for the introduction of this testimony, nor does he allege that the State did not prove he was the perpetrator of these incidents.  Indeed, the State amended its Prieur notice in December 2004 to reflect exactly what evidence it sought to introduce, and Ms. Alexander's lengthy testimony at two pretrial hearings showed by clear and convincing evidence that the appellant engaged in the alleged incidents.  Instead, the appellant argues that the prejudicial effect of this evidence far outweighed its probative value.  He questions whether the evidence was admissible to prove either intent or motive, because he insists that the State did not have to show a motive for the murder and did not need to show his intent.  He finally argues that because these events occurred in connection with Ms. Alexander, rather than in connection with Jefferson, they were not admissible in the trial of Jefferson's murder.

> [FN4]  Prior to trial, the court granted the State's Prieur motion as to a May 2002 incident that arose when the appellant hit Ms. Alexander in the mouth outside her apartment, a May 2003 incident wherein he yelled at her and hit the glass of her car window when she was dropping off a friend, and a September 2003 incident wherein he hit her when she went to pick up their child.  At trial, Ms. Alexander did not testify as to these incidents.

Contrary to the appellant's assertions, the State had to prove the appellant's intent to kill or inflict great bodily harm on Jefferson in order to prove he committed a second degree murder.  Likewise, although the State did not have to show a

motive for the killing, it was not precluded from presenting evidence to show why the appellant shot and killed Jefferson, whom he apparently did not know.  It is true that the prior bad acts by the appellant all involved Ms. Alexander and did not pertain to Jefferson.  However, they were all part of a pattern of the appellant's obsession with Ms. Alexander.  The evidence of his prior bad acts showed his continuing intent to keep her from leaving him and from seeing other men; in most of these incidents, the appellant threatened to harm both Ms. Alexander and any man with whom he caught her.  Jefferson's murder and Ms. Alexander's attempted kidnapping were the last incidents in the appellant's escalating attacks on Ms. Alexander.  As such, evidence of the prior incidents was relevant to show the appellant's intent to murder Jefferson as well as his motive for doing so.  The probative value of evidence of these prior offenses far outweighs its prejudicial effect.  Thus, the trial court did not err by allowing the introduction of this evidence.

The appellant also argues that because some of these incidents resulted in municipal convictions, they were inadmissible at trial.  In support, he cites <u>State v. Wilcoxon</u>, 26,126 (La.App. 2 Cir. 6/22/94), 639 So.2d 385, and <u>State v. Johnson</u>, 446 So.2d 1371 (La.App. 1 Cir. 1984).  However, these cases held that convictions for municipal crimes cannot be used for impeachment purposes.  The prior bad acts in this case were not used for impeachment purposes, but rather to show intent and motive as per La.C.Cr.P. art. 404, which allows evidence of not only convictions but also unadjudicated acts committed by the defendant.  Further, in <u>State v. Tolbert</u>, 2003-0330 (La. 6/27/03), 849 So.2d 32, the Court overruled its prior jurisprudence and found that convictions for municipal offenses could be used for impeachment purposes.

The State gave adequate pretrial notice of the incidents it sought to introduce at trial, and it proved by clear and convincing evidence through Ms. Alexander's pretrial testimony that the appellant committed these acts.  The testimony was properly introduced to show intent and motive, and its probative value outweighed its prejudicial effect.  Therefore, the trial court did not err by allowing the introduction of this evidence.  This assignment of error has no merit.[22]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[23]

The United States Fifth Circuit Court of Appeals has held:  "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."  <u>Little v. Johnson</u>,

---

[22] <u>State v. Colbert</u>, 990 So.2d 76, 86-89 (La. App. 4th Cir. 2008); State Rec., Vol. 2 of 13.
[23] <u>State v. Colbert</u>, 8 So.3d 579 (La. 2009); State Rec., Vol. 2 of 13.

162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state

courts misapplied state evidence law, his claim simply is not reviewable in this federal proceeding.

    To the extent that petitioner is asserting a federal claim, he fares no better.  Even if

petitioner could show that the evidence was in fact improperly admitted, which is questionable at

best for the reasons explained by the Louisiana Fourth Circuit Court of Appeal, federal habeas

relief still would not be warranted.  The United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless
> those errors result in a "denial of fundamental fairness" under the Due Process
> Clause.  The erroneous admission of prejudicial evidence will justify habeas relief
> only if the admission was a crucial, highly significant factor in the defendant's
> conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862

("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly

significant role in the trial will habeas relief be warranted.").

    Here, it cannot be said that the evidence played a crucial, critical, and highly significant

role in petitioner's conviction.  Rather, even aside from the "other crimes" evidence, there was

compelling evidence of petitioner's guilt of the instant offenses, i.e. the testimony of Jennifer

Alexander.  In light of that testimony, which the jury obviously found credible, it is simply cannot

be said that the evidence now challenged by petitioner played a "crucial, highly significant factor"

in his conviction.

    In summary, petitioner has failed to demonstrate that the state court's decision was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined by

the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard,

this Court should likewise reject his evidentiary claim.

## **Excessive Sentences**

Petitioner also argues that his sentences are excessive.  On direct appeal, the Louisiana

Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he appellant contends that the trial court imposed excessive sentences in this case.  The trial court imposed a forty-year sentence for the manslaughter conviction and a twenty-year sentence for the attempted second degree kidnapping conviction, the maximum sentences for both counts.  See La. R.S. 14:31; 14:27/44.1.  Although the appellant's motion to reconsider sentence was not timely filed, after the court imposed the sentences, counsel moved to appeal the appellant's sentences.  Thus, his sentencing claim was preserved for appeal.
>
> In State v. Smith, 2001-2574, p. 7 (La. 1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
>
>> Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to … *excessive … punishment*." (Emphasis added.)  Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979).  A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering.  State v. Bonanno, 384 So.2d 355, 357 (La. 1980).  A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion.  State v. Cann, 471 So.2d 701, 703 (La. 1985).  On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.  State v. Walker, 00-3200, p. 2 (La. 10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La. 11/15/02), 831 So.2d 905, 906.
>
> See also State v. Johnson, 97-1906 (La. 3/4/98), 709 So.2d 672; State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Landry, 2003-1671 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235.
>
> In Batiste, at p. 18, 947 So.2d at 820, this court further explained:
>
>> An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed.  State v. Landry, *supra*; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744

28

So.2d 181.  However, as noted in <u>State v. Major</u>, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:

> The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions.  Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1.  <u>State v. Lanclos</u>, 419 So.2d 475 (La. 1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed.  La.C.Cr.P. art. 881.4(D).

> If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged."  <u>State v. Landry</u>, 2003-1671 at p. 8, 871 So.2d at 1239.  See also <u>State v. Bonicard</u>, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.

Here, the court more than adequately complied with La.C.Cr.P. art. 894.1. The court stated that it had reviewed the presentence investigation report, in which the appellant noted that he "made a serious error in judgment that resulted in the death of another person," but he had been obsessed with Ms. Alexander.  The court stated that although the jury found the appellant guilty of manslaughter, he had been charged with second degree murder.   The court then detailed the appellant's criminal record, which included juvenile adjudications since 1994 and adult arrests and convictions since 2000.  He had arrests for disturbing the peace, simple criminal damage to property, criminal trespass, lewd conduct, domestic violence, intimidation, disturbing the peace, and possession of burglary tools.  He pled guilty to theft in 2001 and received a suspended sentence.  With respect to the present offenses, the court noted that the murder victim was "in the wrong place at the wrong time, with the wrong person."  The court then applied the factors of La.C.Cr.P. art. 894.1 to this case, both aggravating and mitigating, noting that the victim was not armed, did not initiate nor participate in the incident that led to the shooting, but

> was merely, in this Court's estimation, an innocent bystander to an awful relationship that should have ended a long time before the night that Mr. Jefferson wandered into Ms. Alexander's life.  And unfortunately for him and for his family that sits here today in court,

> as they always sat here, they have to live with the results forever of your relationship and your actions with the victim in this case. And whether one side is more right or one side is more wrong, the end result is the same, that one person is dead needlessly, violently, and without any remorse.

(5/11/07 sent. tr. p. 8)  The court then sentenced the appellant to serve forty years at hard labor for the manslaughter conviction and twenty years at hard labor without benefit of parole, probation, or suspension of sentence for the attempted second degree kidnapping sentence, the sentences to run concurrently.

The appellant nonetheless argues that the imposition of maximum sentences on both counts was an abuse of the trial court's sentencing discretion.  In support, he cites State v. Soraparu, 96-0116 (La.App. 4 Cir. 2/5/97), 688 So.2d 1320, where this court found that the trial court had twice abused its discretion by imposing the maximum sentence on a defendant who, like the appellant, was charged with second degree murder but was convicted of manslaughter.  However, the Supreme Court reversed this portion of this court's opinion and reinstated the trial court's sentence. In a one-paragraph per curiam, the Court stated:

> On appellate review of sentence, the only relevant question is "'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).  For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense."  State v. Sepulvado, 367 So.2d 762, 767 (La. 1979).  In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La. 1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit."  State v. Wimberly, 414 So.2d 666, 672 (La. 1982).  The trial court's finding in this case that the defendant committed a "cold and deliberate act" which would have fully justified the return of a verdict of second degree murder adequately supports the sentence imposed.

State v. Soraparu, 97-1027 (La. 10/13/97), 703 So.2d 608.

Likewise, although the appellant here was convicted of manslaughter, the State originally charged him with second degree murder.  Indeed, the fact that the appellant was lying in wait with a gun when Ms. Alexander and Jefferson arrived on the scene shows that his actions were not exactly spontaneous reactions to seeing Ms. Alexander and Jefferson together.  In addition, this court has upheld forty-year sentences for manslaughter in the past.  See State v. Allen, 2006-1434 (La.App. 4 Cir. 3/7/07), 954 So.2d 779 (the defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet); State v. Bell, 2002-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429 (the defendant, who had no prior convictions, stabbed her lover; she had been charged with second degree murder); State v. Jones, 2001-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623 (the defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought).  Given the circumstances of this case, we cannot say that the trial court abused its discretion by imposing the maximum sentence for manslaughter.

Moreover, we do not find that the trial court abused its discretion by imposing the maximum sentence for the attempted second degree kidnapping count.  Although we found no reported Louisiana cases reviewing sentences for attempted second degree kidnapping[FN7], in State v. Woodberry, 95-2402 (La.App. 4 Cir. 12/27/96), 686 So.2d 984, this court upheld a thirty-five-year sentence for the completed crime of second degree kidnapping where the defendant grabbed the victim at gunpoint, carried her off in his car, sexually assaulted her, and then robbed her.  Other courts have upheld maximum sentences for the completed crime of second degree kidnapping where the kidnapping occurred in connection with other crimes.  See State v. Office, 2007-193 (La.App. 3 Cir. 10/3/07), 967 So.2d 1185 (the defendant shot at the victim as the victim tried to escape; he was convicted of second degree kidnapping and armed robbery) State v. Moore, 37,935 (La.App. 2 Cir. 1/28/04), 865 So.2d 227 (the defendant was convicted of armed robbery, second degree kidnapping, and attempted second degree murder, where he shot the victim and left the victim for dead; his consecutive maximum sentences on all counts were affirmed); State v. Brock, 37,487 (La.App. 2 Cir. 9/26/03), 855 So.2d 939 (the defendant, convicted of aggravated burglary and second degree kidnapping, entered the victim's home, robbed her, forced her to go with him, then left her for dead; his concurrent maximum sentences on all counts were affirmed); State v. Lefevre, 02-592 (La.App. 5 Cir. 10/29/02), 831 So.2d 398 (kidnappings occurring during a robbery of a store; the defendant was convicted of armed robbery, second degree kidnapping, and aggravated burglary; the court upheld the maximum sentences on each count but amended the sentences to run concurrently rather than consecutively).

> [FN7] In State v. Durand, unpub. 99-1116 (La.App. 4 Cir. 1/12/00), 761 So.2d 820, this court upheld a forty-year sentence for a defendant convicted of attempted second degree kidnapping and sentenced as a multiple offender.
>
> Here, as in the cases cited above, the kidnapping occurred during an incident involving other crimes.  Although Ms. Alexander, the victim of the attempted second degree kidnapping, was not the victim of the manslaughter, the appellant shot Jefferson because he was with Ms. Alexander.  In addition, the kidnapping was an escalation of the appellant's prior offenses against Ms. Alexander.  Given these factors, we find no error in the trial court's imposition of the maximum sentence for the attempted second degree kidnapping of Ms. Alexander.  This assignment of error has no merit.[24]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[25]

To the extent that petitioner is claiming that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding.  As already noted herein, federal habeas corpus relief is available only to correct violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998).  Accordingly, a federal habeas court will not review the legality of a petitioner's sentence under state law.  See, e.g., Nyberg v. Cain, Civ. Action No. 15-98, 2015 WL 1540423, at *12 (E.D. La. Apr. 7, 2015); Phillips  v. Cain, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), adopted, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); Brunet v. Goodwin, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), adopted, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

---

[24] State v. Colbert, 990 So.2d 76, 91-95 (La. App. 4th Cir. 2008) (footnotes omitted); State Rec., Vol. 2 of 13.
[25] State v. Colbert, 8 So.3d 579 (La. 2009); State Rec., Vol. 2 of 13.

On the other hand, to the extent that petitioner is claiming that his sentence is excessive under *federal* law, that claim obviously is cognizable; however, it is also meritless.  Even considering petitioner's argument that his sentences are harsh because they are the maximum sentences permitted by the applicable statutes, the mere fact that a sentence is harsh does not mean that it is unconstitutionally excessive.  For the following reasons, petitioner's sentences do not cross that impermissible line.

In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed."  "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts."  United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)).  "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes."  Gonzales, 121 F.3d at 942 (quotation marks omitted).  "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare."  Id.  (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence.  Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment." Gonzales, 121 F.3d at 943. In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses. The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check. The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law. Nevertheless, we can say with certainty that the life sentence approved in Rummel falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

Here, petitioner's sentences fell within the ranges provided by law. Moreover, his crimes, manslaughter and attempted second degree kidnapping, were particularly serious. In light of those considerations, as well as the finding in Rummel that a life sentence was not excessive for the relatively minor offenses involved in that case, this Court cannot conclude that petitioner's sentences for his much graver offenses are grossly disproportionate under federal law. Because the sentences are not grossly disproportionate, this Court's "inquiry is finished." Gonzales, 121 F.3d at 942.

### Ineffective Assistance of Counsel/Denial of Right to Appeal

Petitioner next claims that he received ineffective assistance of counsel. The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient

34

*and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Matheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

In the state post-conviction proceedings, the state district court denied petitioner's ineffective assistance of counsel claim on the merits, stating simply that he "failed to demonstrate that he is entitled to relief."[26]  Without additional reasons assigned, his related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal[27] and by the Louisiana Supreme Court.[28]  Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

---

[26] State Rec., Vol. 2 of 13, Judgment dated August 12, 2013; State Rec., Vol. 1 of 13, minute entry dated August 12, 2013.

[27] State v. Colbert, No. 2013-K-1358 (La. App. 4th Cir. Oct. 16, 2013): State Rec., Vol. 2 of 13.

[28] State ex rel. Colbert v. State, 146 So.3d 206 (La. 2014): State Rec., Vol. 2 of 13.

Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and*

> *§ 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 105 (citations omitted; emphasis added).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt."  <u>Woods v. Etherton</u>, No. 15-723, 2016 WL 1278478 (U.S. Apr. 4, 2016) (emphasis added).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

With respect to his trial counsel, petitioner first argues that counsel was ineffective for failing to challenge the accuracy of the presentence investigation report on the basis that "fabrications existed within the report."[29]  In pertinent part, Louisiana law provides:

> If a defendant is convicted of a felony offense or a misdemeanor offense that has been reduced from a felony, the court may order the Department of Public Safety and Corrections, division of probation and parole, to make a presentence investigation. …  In making the investigation, the probation officer shall inquire into the circumstances attending the commission of the offense, the defendant's history of delinquency or criminality, his family situation and background, economic and employment status, education, and personal habits.

La. Code Crim. P. art. 875(A)(1).  Louisiana law further provides:

> Defendant is entitled to have access to the non-confidential portions of his presentence investigation report in order to ascertain the presence of any adverse information contained therein.  <u>State v. Underwood</u>, 353 So.2d 1013 (La. 1977).  He must be given an opportunity to deny or explain significant information contained in the report.  <u>State v. Bosworth</u>, 360 So.2d 173 (La. 1978).  In order to rebut information contained in such a report, a showing must be made that false and

---

[29] Rec. Doc. 1, pp. 44-45.

prejudicial information was contained therein.   <u>State v. Davis</u>, 528 So.2d 615 (La.App. 2d Cir. 1988), <u>writ denied</u>, 531 So.2d 472 (La. 1988).

<u>State v. McNair</u>, 597 So. 2d 1096, 1103 (La. App. 2nd Cir. 1992).

Here, the transcript reflects that defense counsel had in fact reviewed the presentence investigation report,[30] and petitioner has offered no evidence, other than his own self-serving statements, that counsel failed to share or review that report with him or to point to any particular information in the report which was in fact demonstrably false.[31]

Moreover, even if any of information in the presentence report could be shown to be problematic in any respect and should have been rebutted by counsel, petitioner cannot establish that he was actually prejudiced by counsel's failure to do so.   On the contrary, the judge gave extensive reasons for the sentences imposed, and it is evident from her comments that her decision was primarily based on the evidence at trial and the heinousness of the crime.   For example, she stated:

> [Louisiana Code of Criminal Procedure Article 894.1] sets forth the factors that the Court is to use in determining the sentence that should be imposed.  Number one, "That the offender's conduct during the commission of the offense manifested deliberate cruelty to the victim."   I find that this case meets that.   I think that, notwithstanding any relationship that you had with Mr. [sic] Alexander, Mr. Colbert [sic] was put in a situation that night where he was stalked, and struck down, and killed without provocation.
>
> Number five, "The offender knowingly created a risk of death or great bodily harm to more than one person."   That element was met.
>
> "That the offender used threats of or actual violence in the commission of the offense; that the offense resulted in a significant permanent injury or significant economic loss to the victim or his family; that the offender used a dangerous weapon in the commission of the offense."

---

[30] State Rec., Vol. 11 of 13, transcript of May 11, 2007, p. 3.

[31] Petitioner's primary allegation is that the report alleged that petitioner had said that he was obsessed with Alexander and had made "serious error in judgment that resulted in a death of another person."   <u>See</u> Rec. Doc. 1, p. 45.  However, the transcript indicates that the foregoing statement was not in the report – rather, the statement was in fact made to *petitioner's counsel*, and then relayed to the court *by counsel at petitioner's request*.   State Rec., Vol. 11 of 13, transcript of May 11, 2007, pp. 3-4.

> Number twelve, "The offender was persistently involved in similar offenses not already considered as criminal history or as part of a multiple offender adjudication; that the offender foreseeably endangered human life by discharging a firearm during the commission of the offense; and that he used a firearm during this offense."
>
> There are also mitigating factors that the Court has considered that I don't feel apply to this situation in light of the fact, again, that the overwhelming evidence and facts in this case showed that Mr. Jonathan Jefferson neither had a weapon, did not bring on this controversy, did not participate in this controversy, and was merely, in this Court's estimation, an innocent bystander to an awful relationship that should have ended a long time before the night that Mr. Jefferson wandered into Ms. Alexander's life. And unfortunately for him and for his family that sits here today in court, as they have always sat here, they have to live with the results forever of your relationship and your actions with the victim in this case.
>
> And whether one side is more right or one side is more wrong, the end result is the same, that one person is dead needlessly, violently, and without any remorse.
>
> The Court finds that any lesser sentence than the one its [sic] about to impose would certainly deprecate the seriousness of this offense, and deprecate the seriousness of the loss that has been imposed on Mr. Jefferson's family.[32]

Because it is evident that the judge's sentencing decision was primarily based on petitioner's conduct with respect to the instant crime, petitioner cannot show that there is a reasonable probability that his sentence would have been less severe if only his counsel had challenged the presentence investigation report. Accordingly, this claim fails.

Petitioner next argues that counsel was ineffective for recommending that petitioner cooperate with the officer preparing the presentence investigation report and for failing to accompany petitioner to the presentence investigation interview.[33] This claim, too, obviously has no merit.

Assuming for the purposes of this decision that counsel did in fact give petitioner such advice, petitioner has not explained how such advice constituted deficient performance or what

---

[32] State Rec., Vol. 11 of 13, transcript of May 11, 2007, pp. 7-8.
[33] Rec. Doc. 1, p. 46.

prejudice resulted.  As an initial matter, an attorney's advice that his client cooperate with such an interview "is more properly characterized as a strategic decision to avoid additional prison time, rather than ineffective assistance of counsel.  Generally, there is a 'strong presumption' that counsel's conduct 'falls within the wide range of reasonable professional assistance,' and a disagreement with counsel's strategy will not validate a finding of ineffective assistance of counsel." Kaltreider v. Quarterman, Civ. Action No. H-06-1312, 2007 WL 433269, at *3 (S.D. Tex. Feb. 6, 2007).  Further, even if such advice were somehow deficient, it is difficult to imagine how petitioner was prejudiced in any event. For example, one can hardly imagine that the judge would have looked kindly on a refusal by petitioner to cooperate during the interview or that such a refusal would have made the judge inclined to impose a less severe sentence.

As for the fact that counsel failed to accompany petitioner to the interview, it appears that petitioner had no right to counsel at that stage of the proceeding under either state or federal law. The Louisiana Second Circuit Court of Appeal has observed:

> Many federal courts, and at least one Louisiana court of appeal, have held that a defendant does not have a right to counsel during an interview with a probation officer in the presentence investigation.  In Brown v. Butler, 811 F.2d 938 (5th Cir. 1987), the defendant was convicted of forgery.  During the presentence investigation interview, the defendant informed the probation officer that he had supported himself for a number of years by periodically traveling across the country passing bad checks.  The court rejected the defendant's argument that he was entitled to counsel during the interview, stating:
>
>> [The defendant] was interviewed by a probation officer, who is an arm of the court charged with assisting the court in arriving at a fair sentence.  We conclude that such an interview is not a critical stage of the proceeding in which counsel's presence or advice is necessary to protect the defendant's right to a fair trial.
>
> Id. at 941.  See also, State v. Pete, 2003-0694 (La.App. 4th Cir. 9/24/03), 857 So.2d 1107; Castro v. Ward, 138 F.3d 810 (10th Cir. 1998); United States v. Gordon, 4 F.3d 1567 (10th Cir. 1993); U.S. v. Tisdale, 952 F.2d 934 (6th Cir. 1992); United

> States v. Hicks, 948 F.2d 877 (4th Cir. 1991); United States v. Jackson, 886 F.2d
> 838 (7th Cir. 1989); Baumann v. United States, 692 F.2d 565 (9th Cir.1982).
>     We conclude that the predisposition investigation does not constitute a stage
> of the proceedings such that the defendant was entitled to counsel.

State ex rel. B.A.A., 13 So.3d 1183, 1190 (La. App. 2nd Cir. 2009).  Courts have therefore held

that because a petitioner has no right to the assistance of counsel with respect to a presentence

interview, he cannot assert a claim for the denial of the effective assistance of counsel in

connection with such an interview.  United States v. Williams, No. 94-30115, 1994 WL 621202,

at *1 (9th Cir. Nov. 8, 1994); United States v. Gordon, 4 F.3d 1567, 1572 (10th Cir. 1993); United

States v. Svete, No. 3:04cr10, 2014 WL 941448, at *25 (N.D. Fla. Mar. 11, 2014).  Nevertheless,

in any event, even if counsel could have accompanied petitioner to the interview, petitioner has

failed to show how he was prejudiced by his counsel's absence.  For that reason alone, his

ineffective assistance of counsel claim would fail.

    Petitioner next argues that his counsel was ineffective for denying petitioner's right to

testify on his own behalf at trial.[34]  It is unclear from petitioner's vague claim whether he asserting

that his counsel refused to allow him to testify despite a stated desire to do so, or whether he is

instead asserting only that counsel was ineffective for failing to call him to testify.  However, as

explained below, petitioner has not established a constitutional violation under either of those two

scenarios.

    If petitioner is alleging the former, "it cannot be doubted that a defendant in a criminal case

has the right to take the witness stand and to testify in his or her own defense."  Rock v. Arkansas,

483 U.S. 44, 49 (1987).  However, petitioner has offered nothing other than his own self-serving

---

[34] Rec. Doc. 1, p. 9.

allegations in support of his claim.  He does not allege, and the record does not suggest, that he ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so.  Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue.  See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003).  Nevertheless, this Court cannot ignore the fact that petitioner has never presented any evidence to corroborate his allegations.  As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable.  It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen.  Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify.  Therefore I'm entitled to a new trial." ...
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him.  It just is too facile a tactic to be allowed to succeed.  Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); accord Richthofen v. Cain, Civ. Action No. 05-5701, 2008 WL 630477, at *44-45 (E.D. La. Mar. 7, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *8-9 (E.D. La. Feb. 13, 2008); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); White v. Cain, Civ. Action No, 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006); Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005).

If, on the other hand, petitioner is claiming only that his counsel was ineffective in failing to call him testify, that contention likewise fails.  A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight."  United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb.13, 2008).  Further, such a matter is inherently one of trial strategy, and federal habeas courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  Strickland, 466 U.S. at 689.

The instant habeas proceeding is far removed from the context of the actual trial, and this Court has no mechanism available to fairly judge counsel's assessment of his own client at the time and his view of the strength of the prosecution's case as it was presented live.  Under these circumstances and in light of the foregoing law regarding the deference that must be accorded to counsel's strategic decisions, the Court declines to second-guess counsel's decision not to put petitioner on the stand.  This Court simply cannot find that counsel performed deficiently by failing to have petitioner testify at trial.

Petitioner also lists on his petition claims that his trial counsel was ineffective for failing to prepare an adequate defense, perform an adequate investigation, subpoena witnesses, and adequately cross-examine the state's witnesses.[35]  However, those claims are not discussed in his

---

[35] Rec. Doc. 1, p. 9.

accompanying memorandum, and the United States Fifth Circuit Court of Appeals "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding."   Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000). Nevertheless, out of an abundance of caution, the undersigned notes that the claims also fail for the following additional reasons.

As to the contention that counsel failed to prepare an adequate defense, petitioner identifies no potentially viable defense which counsel eschewed.  Sometimes, as is evidently the case here, when representing a seemingly guilty client, counsel's only choice is to vigorously test the state's case and argue to the jury that the state has failed to carry its burden of proving that the accused is guilty beyond a reasonable doubt.  Simply because counsel was unable to fashion a nonexistent defense out of whole cloth does not mean that he performed deficiently or that prejudice resulted. See, e.g., Robinson v. Cooper, Civ. Action No. 12-1327, 2013 WL 2154011 (E.D. La. May, 21, 2013); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *9 (E.D. La. Mar. 20, 2008). Therefore, this contention has no merit.

With respect to petitioner's contention that his counsel's investigation was inadequate, petitioner has failed to offer any evidence as to what specific investigatory steps counsel purportedly failed to take.  Further, even if petitioner had shown that counsel failed to investigate particular issues, petitioner would additionally have to prove that prejudice resulted.  To make that showing, he must point to evidence in the record demonstrating that further investigation would actually have revealed additional information beneficial to the defense.  See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd,

641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10

(E.D. La. Dec. 11, 2008).  Here, he has not shown that any such beneficial information would have

been revealed by additional investigation.

　　　　The same defect exists with respect to petitioner's contention that his counsel should have

subpoenaed witnesses to testify at trial.  As the United States Fifth Circuit Court of Appeals has

explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.*  This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets

omitted; emphasis added); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o

prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner

must name the witness, demonstrate that the witness was available to testify and would have done

so, set out the content of the witness's proposed testimony, and show that the testimony would

have been favorable to a particular defense.").

　　　　Here, petitioner has failed even to identify the uncalled witnesses, much less provided

affidavits or other evidence demonstrating that they would have testified in a manner beneficial to

the defense.  Therefore, again, petitioner, has clearly failed to meet his burden with respect to this

claim.  See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with

great caution claims of ineffective assistance of counsel when the only evidence of a missing

witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

As to petitioner's contention that his counsel was ineffective for failing to adequately cross-examine the state's witnesses at trial, he has also failed to meet his burden of proof with respect to that claim. As an initial matter, the Court notes that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005); see also Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 Fed. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 Fed. App'x 462 (5th Cir. 2009); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006). As already noted, courts are not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, they are to employ a strong presumption

that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  <u>Strickland</u>, 466 U.S. at 689.  It is irrelevant that another attorney might have made other choices or handled such issues differently.  As the Supreme Court noted:  "There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  <u>Id</u>.  In any event, petitioner has not identified any relevant questions that counsel failed to ask on cross-examination.  Nevertheless, the Court has reviewed the transcripts and finds that counsel's cross-examination was not deficient and that petitioner was not prejudiced by counsel's performance.

Petitioner's claim that his appellate counsel was likewise ineffective fares no better.  Specifically, petitioner argues that his appellate counsel was ineffective for failing to obtain a full record of the trial proceedings in connection with the direct appeal, alleging that the record on appeal did not include the voir dire examination, objections, opening statements, and closing arguments.[36]  However, the record was clearly adequate for the appellate courts to adjudicate the claims asserted on appeal, in that none of those claims concerned the portions of the proceedings which were not transcribed.  Obviously, appellate counsel does not perform deficiently, and no prejudice results, as a result of counsel's failure to order portions of the record that are irrelevant to the claims asserted.

If petitioner is perhaps arguing that appellate counsel *should have* asserted *additional* claims arising from the portions of the proceedings that were not transcribed, that claim likewise fails.  In the first place, petitioner has not shown that any errors occurred during the portions of the

---

[36] Rec. Doc. 1, p. 6.

48

proceedings which were not transcribed.  Second, even if he could show that such errors occurred and that nonfrivolous claims could have been asserted based on those errors, that still would not entitle him to relief.  It is clear that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."  West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."  Id. at 753.  Rather, the applicable test to be applied in assessing such a claim is instead whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal.  See, e.g., Diaz v. Quarterman, 228 Fed. App'x 417, 427 (5th Cir. 2007); accord Smith v. Robbins, 528 U.S. 259, 288 (2000).  Because petitioner has not shown that the untranscribed portions of the proceedings contained any errors, much less errors that could serve as a basis for claims on appeal that were clearly stronger than the claims asserted, he obviously cannot show that appellate counsel was ineffective for failing to raise those claims and to provide the portions of the record necessary to support them.

Lastly, to the extent that petitioner is simply arguing that the mere fact that the record included only a partial transcript violated his right to appellate review,[37] that claim clearly has no merit.  As the United States Fifth Circuit Court of Appeals has explained:

> [T]he state is not obligated to automatically supply a complete verbatim transcript, and a State need not waste its funds providing for free those parts of the transcript

---

[37] See Rec. Doc. 1, p. 8.

that are not germane to consideration of the appeal.  Nor is the state required to furnish complete transcripts so that the defendants may conduct fishing expeditions to seek out possible errors at trial.

Kunkle v. Dretke, 352 F.3d 980, 985-86 (5th Cir. 2003) (citations, quotation marks, brackets, and ellipsis omitted).  Because petitioner has not shown that the untranscribed portions were necessary for adequate appellate review, he has not established that his rights were violated by the "partial" record.

## RECOMMENDATION

It is therefore **RECOMMENDED** that federal application for *habeas corpus* relief filed by Jeremy Colbert be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[38]

New Orleans, Louisiana, this twelfth day of April, 2016.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[38] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.